**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 25-cr-143-WJM-1

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. **CAYETANO JUAREZ-VASQUEZ**,

    Defendant.

---

**ORDER DENYING THE UNITED STATES' EMERGENCY MOTION FOR
DE NOVO HEARING AND RECISION [*SIC*] OF MAGISTRATE JUDGE'S
PRETRIAL RELEASE ORDER PURSUANT TO PROVIONS [*SIC*] OF
THE BAIL REFORM ACT AT 18 U.S.C §§ 3142(e) AND (f)(1)(E) AND 3145**

---

This matter is before the Court on the United States' Emergency Motion for *De Novo* Hearing and Recission of Magistrate Judge's Pretrial Release Order Pursuant to Provisions of the Bail Reform Act at 18 U.S.C. §§ 3142(3), (f)(1)(E), and 3145.  (ECF Nos. 27, 33) ("Motion").[1]   Defendant Cayetano Juarez-Vasquez filed a response (ECF No. 37), to which the Government filed a reply (ECF No. 40).

For the reasons set forth below, the Court finds that the relevant factors under the Bail Reform Act, 18 U.S.C. § 3142, counsel that Juarez-Vasquez should continue on bond under the conditions of release imposed by U.S. Magistrate Judge Timothy P. O'Hara.   Accordingly, the Motion is denied.

---

[1] The day after the Government filed the Motion, it filed an Errata to correct erroneous statements that Juarez-Vasquez had been removed on eight occasions; the correct number is six.  (ECF No. 33 at 1 n.1.)   For the avoidance of confusion, the Court cites only to the Errata when referring to the Government's arguments herein.

## I. LEGAL STANDARDS

### A. Bail Reform Act

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987). Thus, under the Bail Reform Act, a defendant may be detained pending trial only if a judicial officer finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e); *id.* § 3142(b), (c). The judicial officer may make such a finding only after holding a hearing according to the procedures specified in § 3142(f). The government bears the burden to prove risk of flight by a preponderance of the evidence and dangerousness to any other person or to the community by clear and convincing evidence. *See id.* § 3142(f).

"[I]n determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer must consider:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*Id.* § 3142(g).

**B.      Standard of Review**

"If a person is ordered released by a magistrate judge," then "the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release." 18 U.S.C. § 3145(a)(1).   The district judge then reviews the magistrate judge's decision *de novo*.   *United States v. Cisneros*, 328 F.3d 610, 616 n.1 (10th Cir. 2003).

> *De novo* review, however, does not necessarily mean holding an evidentiary hearing.   Although a district court may start from scratch and take evidence, it may also review the evidence that was before the magistrate judge and make its own independent determination as to whether the magistrate judge's findings and detention order are correct. This is a matter of discretion for the district court.

*United States v. Romero*, 2010 WL 11523871, at *2 (D. Colo. May 17, 2010) (internal quotation marks and citations omitted).

## II.      BACKGROUND[2]

On April 17, 2025, the Government filed a Criminal Complaint charging Juarez-Vasquez with one count of illegal re-entry in violation of 8 U.S.C. § 1326(a).   (ECF No.

---

[2] The Court derives this background from the parties' briefs on the Motion, the documentary evidence submitted by the parties in connection with the April 28 and May 5 detention hearing proceedings, and the transcripts of the detention hearing proceedings on May 5 and May 6, 2025.

3

1.)   Juarez-Vasquez made his initial appearance before Judge O'Hara on April 23, 2025, at which time the Government moved for detention.  (ECF No. 4.)  Judge O'Hara set a detention hearing for April 28.  (*Id.*)  The following day, on April 24, a grand jury indicted Juarez-Vasquez on the same count.  (ECF No. 8.)

In advance of the detention hearing, Juarez-Vasquez submitted four letters of support from family and friends attesting to his positive attributes.  (*See generally* ECF No. 11-1.)  Judge O'Hara admitted the letters proffered by Juarez-Vasquez into evidence.  (ECF No. 13.)

On April 28, Judge O'Hara arraigned Juarez-Vasquez and heard argument from counsel on the issue of detention.  (*Id.*)  As summarized by Juarez-Vasquez, the Government's arguments in favor of detention focused primarily on his ties to Mexico, his multiple removals from the United States, and his criminal history, which is consistent with the Government's arguments in the present Motion.  (ECF No. 37 at 3; *see also generally* ECF No. 33.)  In oppositional support of his release, Juarez-Vasquez informed Judge O'Hara, among other things, that, "if released, he could continue living at the Westminster, Colorado home of his stepdaughter, [] Bustos, and that she was willing to be a third-party custodian."  (ECF No. 37 at 2.)

After hearing the parties' arguments, Judge O'Hara continued the detention hearing to May 5 and directed the parties to gather and submit additional evidence related to two unresolved DUI charges against Juarez-Vasquez from 2019 and 2025.  (ECF No. 13; ECF No. 27 at 2; ECF No. 37 at 3.)  The parties did so on May 2 and May 5, respectively.  (*See* ECF Nos. 16, 20, 21.)

Judge O'Hara considered the additional evidence at the May 5 hearing.  (*See*

ECF No. 25.)   The Court reserves its discussion of Judge O'Hara's particular findings as to the § 1342(g) factors for its analysis below.   However, as summarized in the Release Order entered the following day, he ultimately found "that the government did not meet its burden in demonstrating that there were no conditions that would reasonably assure the defendant's appearance as required and the safety of the community."   (ECF No. 26 at 1.)

Judge O'Hara again continued the detention hearing to May 6 to set appropriate conditions of release.   (*Id.* at 1.)   Following that hearing, Juarez-Vasquez entered a $10,000 unsecured bond, and Judge O'Hara entered an Order Setting Conditions of Release including but not limited to home detention, a curfew, GPS monitoring, abstention from alcohol, outpatient treatment, and a prohibition on driving.   (ECF Nos. 30, 31.)

The Government filed the Motion seeking *de novo* review and recission of Judge O'Hara's Release Order the same day, as well as a stay pending this Court's review on the merits.   (ECF No. 27.)   The Court granted the Government's request for a stay shortly thereafter and set an expedited briefing schedule on the merits, which are now ripe for review.   (ECF No. 28.)

### III.   ANALYSIS

The Court has reviewed the entirety of the documentary evidence submitted by the parties in connection with the detention hearing, as well as the transcripts for the portions of the hearing taking place on May 5 and 6, 2025.   Based on that review, the Court finds that it need not conduct a hearing on the Motion.   *See United States v. Renander*, 431 F. Supp. 3d 1240, 1242 (D. Colo. 2020) (determination of whether to

5

hold an evidentiary hearing is a matter of discretion for the district court) (citation omitted).

"[A]lthough Congress established a rebuttable presumption that certain defendants should be detained, it did not include removable aliens on that list." *United States v. Ailon-Ailon,* 875 F.3d 1334, 1338 (10th Cir. 2017). As a result, the Government bears the ultimate burden of proof to show there is no condition or combination of conditions that would reasonably assure Juarez-Vasquez's presence in later proceedings and/or the safety of other persons and the community. *U.S. v. Ruiz-Corral,* 338 F. Supp. 2d 1995, 1197 (D. Colo. 2004).

The Government argues that Judge O'Hara erred in finding that he "could impose conditions sufficient to reasonably assure the defendant's appearance at future hearings and the safety of the community." (ECF No. 33 at 2.) In this way, the Government argues pretrial detention is warranted based on both risk of flight, which it most prove by a preponderance of the evidence, and dangerousness to the community, which it must prove by clear and convincing evidence. *Cisneros,* 328 F.3d at 616.

On *de novo* review, the Court independently evaluates the 18 U.S.C. § 3142(g) factors. Ultimately, it reaches the same conclusion as Judge O'Hara.

### A.   Nature and Circumstances of the Offense

First, the Court considers the nature and circumstances of the offense charged—illegal reentry in violation of 8 U.S.C. § 326(a). *See* § 3142(g)(1).

As a threshold matter, the Court does not perceive the Government to argue that the nature and circumstances of the charged offense support a finding that Juarez-Vasquez poses a danger to the safety of the community. As Judge O'Hara found,

6

illegal reentry is not among those crimes "involving violence, firearms, a minor victim, or a controlled substance" specifically enumerated in § 3142(g)(1). (ECF No. 26 at 4.) To the contrary, it is a non-violent, *malum prohibitum* offense—"[a]n act that is a crime merely because it is prohibited by statute, although the act itself is not necessarily immoral." *Black's Law Dictionary* (11th ed. 2019). Juarez-Vasquez further notes the absence of fact-specific circumstances supporting danger, including that he "was arrested without incident," not "attempting to fight . . . the arresting officers." (ECF No. 37 at 9.) In the absence of argument from the Government to the contrary, the Court finds this factor weighs against detaining Juarez-Vasquez based on any asserted danger to the community.[3]

It is a closer call whether the nature and circumstances of the offense weigh in favor of detention to assure Juarez-Vasquez's appearance. The Government contends the offense charged is "by its nature . . . relevant to the question of flight risk . . . , because it speaks to a defendant's propensity to disregard a court order." (ECF No. 40 at 2.) In that case, the instant offense would not mark the first time that Juarez-Vasquez has done so. Immigration and Customs Enforcement ("ICE") has removed him from the United States to Mexico six times. (*Id.*) He also has three prior convictions for illegal reentry from 2012, 2020, and 2021, respectively. (ECF No. 33 at 7.) The Government contends each of these convictions represent an additional

---

[3] To the extent the Government intends to argue that Juarez-Vasquez poses a danger to the community because he has repeatedly violated United States immigration laws, the Court rejects that argument. *See United States v. Aguilar-Avalos,* 471 F. Supp. 3d 1171, 1173 (D.N.M. 2020) ("The fact that resources were expended to prosecute Defendant for prior illegal entry convictions has no bearing on whether Defendant is a danger to the community.").

instance of Juarez-Vasquez's disregard of an immigration judge's removal order.[4]

The Court acknowledges that at least one district court in this Circuit has reasoned that "alleged repetitions of the [illegal reentry] offense indicate a significant probability that Defendant will not abide by conditions placed on him by this court," when considering § 3142(g)(1) under similar factual circumstances. *United States v. Lozoya-Serrano,* 2025 WL 823270, at *5 (D. Kan. Mar. 14, 2025). On the other hand, the Court heeds the Tenth Circuit's advisory that Juarez-Vasquez "cannot be detained solely because he is a removable alien charged with illegal reentry." *United States v. Ramos-Caballero,* 2021 WL 5176051, at *2 (10th Cir. 2021) (citing *Ailon-Ailon,* 875 F.3d at 1338). The Court is wary of finding that a charge of illegal reentry (even repeated ones) weighs in favor of detention merely because the crime is, definitionally, also a violation of an immigration court order. As Judge O'Hara observed, this would seem to insert a presumption where there is none. (*See* ECF No. 26 at 4 n.3.)

For his part, Juarez-Vasquez argues § 3142(g) weighs in favor of release because he is not facing significant time in custody that would incentivize flight. At the May 5 hearing, the Government estimated that Juarez-Vasquez is likely facing a 15-to-21-month sentence. (*See also* ECF No. 26 at 4 ("the offense is not one that carries a significant sentence under the United States Sentencing Guidelines").) He also reiterates that he was "arrested without incident" and did not "attempt[] to . . . flee from

---

[4] The Government also asserts that Juarez-Vasquez's most recent reentry violated the terms of a supervised release order. (ECF No. 33 at 6.) In direct contravention with this argument, however, Judge O'Hara found that Juarez-Vasquez "has never violated a term of supervised release, although the government proffered that he most recently returned to the United States during a period of supervised release." (ECF No. 26 at 5.) The Court is troubled by the Government's failure to address this or explain why Judge O'Hara's conclusion was erroneous. It thus affords it little weight.

the arresting officers." (ECF No. 37 at 9.) The Government's Motion also supports that Juarez-Vasquez submitted peaceably. It states that, after his arrest, Juarez-Vasquez knowingly waived his *Miranda* rights, submitted voluntarily to questioning, and readily admitted to ICE officers that he had reentered the country in October 2022. (ECF No. 33 at 6.)

It is true that Juarez-Vasquez is facing a relatively minor prison sentence. But, more significantly, Juarez-Vasquez also faces deportation. The Court has previously observed that "[a]n illegal reentry charge presumably creates some risk of flight, to avoid deportation after serving a prison sentence." *USA v. Espinoza-Salcido,* Criminal Case No. 18-cr-589-WJM (D. Colo. Jan. 2, 2019) [ECF No. 20], at 4. This appears at face value to be in some tension with the Tenth Circuit's conclusion that "a risk of involuntary removal does not establish a 'serious risk that [the defendant] will flee' upon which pre-trial detention may be based." *Ailon-Ailon,* 875 F.3d at 1337. The Court notes, however, that the precise issue the Tenth Circuit considered in *Ailon-Ailon* was whether the risk that ICE would involuntarily remove the defendant before trial qualified as flight—not whether the defendant would abscond to *avoid* involuntary removal. *Id.* at 1336.

Considering both sides, the Court deems the nature and circumstances of the offense neutral to its analysis of whether detention is warranted based on any risk that Juarez-Vasquez will fail to appear at future court proceedings.

**B.     Weight of the Evidence**

Second, the Court considers the weight of the evidence against Juarez-Vasquez. Juarez-Vasquez does not dispute that the weight of the evidence is strong.

9

(ECF No. 37 at 9.)   But he argues because pretrial detention is not about guilt or innocence, the weight of the evidence "may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community."   *United States v. Motamedi,* 767 F.2d 1403, 1408 (9th Cir. 1985); *see also United States v. Lizardi-Maldonado,* 275 F. Supp. 3d 1284, 1292 (D. Utah 2017) ("[T]o avoid falling down the rabbit-hole into the world into the world of '[s]entence first— verdict afterwards,' the Court considers the strength of the evidence in terms of that evidence's bearing on the risk of harm to the community.   The likelihood of conviction by itself has no bearing on the pretrial release decision.").

As to flight risk, Juarez-Vasquez argues that, "when the weight of the evidence is strong it can provide a person with a strong incentive to flee," but that incentive "is always going to be highest when the penalty the person faces is very high."   (ECF No. 37 at 10.)   Here, however, "the possible penalty is low," so "even strong evidence of guilt does not provide much of an incentive to flee . . . ."   (*Id.*)

The Court agrees that Juarez-Vasquez is facing a relatively moderate prison sentence.   However, as the Court noted above, the more significant penalty Juarez-Vasquez faces here is involuntary removal to Mexico.   This supports at least some risk of flight and, for the same reason, favors detention.

As to danger, the Government argues that the weight of the evidence factor "does not require two separate analyses . . . , one as applied to danger and one to the risk of flight."   (ECF No. 40 at 3.)   However, the Court is unpersuaded that strong evidence of a *nonviolent* crime is much support for the notion that the defendant poses a danger to the community, and on this score the evidence weighs in favor of release.

**C.     Defendant's History and Characteristics**

Third, the Court considers the history and characteristics of Juarez-Vasquez. Judge O'Hara succinctly summarized some of Juarez-Vasquez's pertinent history and characteristics as follows:

> The history and characteristics of the defendant demonstrate that the defendant has resided in the United States for the better part of 30 years.   He is divorced and has three United States citizen children who live in the District of Colorado, with whom he remains in close contact.   He maintains a close relationship with his girlfriend[5] and stepdaughter, Ms. Kaylee Bustos, who has offered her residence as a place for the defendant to stay and is willing to act as a third-party custodian.   Until relatively recently, when he suffered a work-related shoulder injury [for which he has a pending workers compensation claim], he was employed as a bricklayer in the community.   He has multiple convictions for illegal re-entry, none of which resulted in a sentence in excess of ten months.   He also has struggled with a drinking problem, which has resulted in multiple arrests for driving under the influence.

(ECF No. 26 at 4.)   The Court will not independently discuss each and every one of the characteristics listed in § 1342(g)(3) but addresses below those most central to the parties' arguments.

1.     <u>Family Ties</u>

Juarez-Vasquez elaborates in his briefing that he "moved to the Denver area when he was around 20 years old," such that he has "spent almost his entire adult life in this community."   (ECF No. 37 at 10.)   Moreover, "the most important people in [] Juarez-Vasquez's life all live in the Denver area, including his three children from his

---

[5] Based on the letters submitted by Juarez-Vasquez's family the Court understands his current partner is actually his common law wife.   (*See* ECF No. 11-1.)

11

first marriage (ages 26, 21, and 13), their mother (his ex-wife), his new wife, Guadelupe, his two stepdaughters, Bibiana and Kaylee, and his grandchildren." (*Id.*)[6]  Since suffering an injury in a workplace accident, Juarez-Vasquez spends part of his time "helping Kaylee care for her children." (*see also* ECF No. 11-1 at 4.)  The Court agrees with Juarez-Vasquez that their letters demonstrate he "is a valued member of his family, whose character they hold in high regard." (ECF No. 37 at 17 (citing ECF No. 11-1).)

Given his strong ties to the Denver community and relationship with his family, Juarez-Vasquez asserts it is "clear[] he wants to be here with his family, not in Mexico, and has risked prison sentences on multiple occasions to accomplish this goal." (ECF No. 37 at 15.)  Thus, "[i]t does not make sense that, when faced with a new prison sentence, he would suddenly change his mind and flee to Mexico," even though it is easy "to assume someone with Mexican ties would rather flee to Mexico than serve a prison sentence." (*Id.* at 14–15.)

And indeed, the Government makes precisely this argument. (ECF No. 40 at 4.)  It asserts Juarez-Vasquez ignores that he is subject to a Notice of Intent/Decision to Reinstate a Prior Order of Removal, which "means that at the conclusion of the instant proceeding, [he] will be removed to Mexico and separated from his family." (*Id.*)  As a result, the Government reasons "[h]is position is . . . different from a hypothetical person who, although faced with the possibility of prison time, knows that upon release, he will be reunited with his loved ones." (*Id.*)  But here, the Government argues, Juarez-

---

[6] The Motion also contends that Juarez-Vasquez has a ten-year-old son who resides in Mexico, although there is no evidence in the record as to Juarez-Vasquez's relationship with him. (ECF No. 33 at 9.)

Vasquez "has every incentive . . . to flee to Mexico, outside the jurisdiction of this Court, so that he might make yet another illegal re-entry into the United States and return to his family in Colorado."   (*Id.*)

Notwithstanding its observation above that a reinstated removal order is some indicia of flight risk, the Court is persuaded by Juarez-Vasquez's arguments on this point.   Tellingly, the Government does not argue Juarez-Vasquez has absconded to Mexico to avoid conviction and involuntary removal on any prior occasion, despite the fact that his prior arrests for illegal reentry otherwise feature heavily in the Government's Motion.   It appears from the Government's Motion that Juarez-Vasquez was similarly subject to a reinstated removal order on some or all of those prior occasions, too.   (*See* ECF No. 33 at 10 (noting five prior reinstated removal orders in 2011 and 2019).) Thus, while Juarez-Vasquez's immigration situation may support a speculative "risk that he will return to Mexico rather than face the charges in this case,"[7] "[i]n assessing this risk, his history of returning to [Colorado] to live with his [family] suggests [Juarez-Vasquez] does not want to return to Mexico and does want to be with his [family]." *Lizardi-Maldonado,* 275 F. Supp. at 1294.

Accordingly, based on the Court's review of the record, it "finds the likelihood very small that [Juarez-Vasquez] would voluntarily leave his [family] to live somewhere else without them under these circumstances."   *Id.* (*see also* ECF No. 26 at 5 (similarly observing "there is nothing specific to justify the defendant's incentive to flee," but "[h]is

---

[7] Indeed, based on statistics cited by Judge O'Hara in the Release Order, that risk appears *very* speculative.   (*See* ECF No. 26 at 6 (collecting sources published in 2022 indicating a 0.5% failure to appear rate for alien defendants, as compared with a 1.1–1.6% failure to appear rate for non-alien defendants).)

13

ties to the community, including family members, potential employment, and medical care, demonstrate multiple incentives to stay").)

    2.    <u>Alcohol Abuse</u>

Juarez-Vasquez has three misdemeanor DUIs from 1995, 2000, and 2007 and, more recently, two pending felony DUI charges from 2019 and 2025. (ECF No. 33 at 8.) While acknowledging the age of the three misdemeanor DUIs, the Government argues that, when viewed together with the more recent 2019 and 2025 charges, "the evidence demonstrates that the defendant has a longstanding problem with substance abuse." (ECF No. 40 at 5.) Based on its independent review of the record, the Court is persuaded that Judge O'Hara carefully considered the 2019 and 2025 DUI charges and afforded them appropriate weight in deciding whether Juarez-Vasquez should be released.

As noted in Section II *infra*, Judge O'Hara continued the detention hearing for the particular purpose of considering additional evidence regarding the pending DUI charges. Specifically, Judge O'Hara directed the Government to obtain police reports for the 2019 and 2025 DUI arrests, so he could verify Juarez-Vasquez's assertion during the April 28 proceedings that the 2025 DUI charge did not arise from his use of alcohol but instead the use of prescription medication to treat his shoulder injury. (ECF No. 33 at 2; ECF No. 37 at 3.) He asked Juarez-Vasquez to provide an additional letter from a family member concerning his present use of alcohol and proof that he had been prescribed drugs to treat his injury. (ECF No. 37 at 3.)

The 2019 police report showed that Juarez-Vasquez was pulled over after the officer observed him change lanes through two gore points. (ECF No. 16-1 at 4.)

Juarez-Vasquez consented to a breath test and registered a blood alcohol level of .193 and, after a 20-minute deprivation period, .201—undeniably well over the legal limit. (*Id.*)

The February 2025 police report, on the other hand, showed that Juarez-Vasquez was pulled over for illegal window tinting. (ECF No. 16-2 at 4.) The officer believed Juarez-Vasquez was driving under the influence based on his conduct during the traffic stop. (*Id.* at 5–6.) A breath test administered after he was taken into custody showed his blood alcohol level was .0333, below the legal limit. (*Id.* at 7.) However, Juarez-Vasquez admitted he was prescribed oxycodone and took the prescription the night prior. (*Id.*)

The officer, a certified Drug Recognition Expert instructor ("DRE"), opined that Juarez-Vasquez "was under the combined influence of ethyl alcohol, Central Nervous System Depressants, Narcotic Analgesics, and Cannabis." (*Id.*) Juarez-Vasquez denied the use of cannabis. (*Id.*) The Government was unable to explain at the May 5 hearing how the DRE arrived at the conclusion that Juarez-Vasquez was under the influence of cannabis, and whether "Central Nervous System Depressants" and "Narcotic Analgesics" was meant to encompass a substance(s) other than alcohol or oxycodone. Juarez-Vasquez was ultimately charged with driving under the influence of drugs. (*Id.; see also* ECF No. 20-1 at 2.)

For his part, Juarez-Vasquez filed a second letter from his stepdaughter, Kaylee Bustos, with whom he resides, as well as a copy of his medical records from Midtown Occupational Health Services in Denver, Colorado. (ECF No. 20.) Bustos wrote that she knew Juarez-Vasquez to "drink[] on different occasions but mostly just on the

15

weekends," and she "never witnessed him driving under the influence." (ECF No. 20-1 at 1.) Rather, she stated her mother (Juarez-Vasquez's wife) has "always been the driver." (ECF No. 20-1 at 1.) Bustos also wrote that Juarez-Vasquez has "always been around [her] daughter and he doesn't drink when she's in his care," nor would Bustos allow him to be around her children "if he were a drunk." (*Id.*)

The medical records, dated November 2024, evidence Juarez-Vasquez was previously diagnosed with a "[f]ull thickness rotator cuff tear" and "cervical radiculopathy." (ECF No. 21-1 at 1.) The records further demonstrated that Juarez-Vasquez underwent surgery in October 2024; that his treating physicians had prescribed him, among other medications, oxycodone; and that he had been instructed to attend physical therapy twice a week for six weeks. (*Id.*) His physicians notated they "[a]nticipate[d] permanent impairment." (*Id.*)

Upon review of this further evidence during the May 5 proceedings, Judge O'Hara found that, although the 2019 offense involved a high level of alcohol, it did not involve an accident or bodily injury, in which case it would command a higher sentence. As to the 2025 offense, he noted the circumstances were "a little more puzzling" and questioned whether the information in the police report was sufficient to show, beyond a reasonable doubt, that Juarez-Vasquez was driving under the influence. He observed that, although Juarez-Vasquez admitted to ingesting oxycodone the night before, the amount that was still in his system the next day was likely little, and the DRE otherwise seemed to be "guessing" as to the substances in Juarez-Vasquez's system. These considerations led to his conclusion in the Release Order that "the evidence relating to the 2025 arrest does not appear strong." (ECF No. 26 at 4.)

16

The Court agrees with Judge O'Hara's assessment of this evidence and finds the Government has not given it a compelling reason to depart therefrom.   While the prior DUI charges are indicative of some moderate risk of danger to the community, the Court also agrees with Judge O'Hara that "[w]ith the conditions that forbid [Juarez-Vasquez's] consumption of alcohol and driving a motor vehicle, along with random alcohol screening, substance abuse treatment, a third party custodian, and home detention with a curfew, the Court can reasonably assure the safety of the community . . . ."   (ECF No. 26 at 4.)

3. Non-Appearances

The Government lastly reiterates that Juarez-Vasquez "has been removed from the United States on six occasions since 2008, demonstrating both his willingness to violate court orders and his ability to cross the southern border of the United States with ease."   (ECF No. 40 at 6.)

In rebuttal to Juarez-Vasquez's assertion that "the decision to reenter the country without permission . . . does not shed much light on the question of whether there are conditions of release that will reasonably assure a person's appearance," (ECF No. 37 at 14), the Government notes the authority relied upon by Judge O'Hara in the Release Order, *United States v. Figueroa-Alvarez,* 681 F. Supp. 3d 1131 (D. Id. 2023), itself states that a defendant's "multiple unlawful entries into the United States" is a primary factor "courts should consider in determining whether a defendant charged with violating § 1326 presents a *risk of non-appearance* under § 3142(g)."   *Id.* at 1139.   This is indeed so.

Nevertheless, considering the additional *Figueroa-Alvarez* factors, Judge O'Hara

17

also observed that "[w]hile the defendant has failed to appear in court previously, the defendant's recent failures to appear largely can be attributed to being in immigration custody at the time he is scheduled to appear." (ECF No. 26 at 5.) For instance, the Pretrial Services Report ("PTSR") "notes that the defendant failed to appear twice" in connection with an Adams County criminal case, but both failures to appear "corresponds to a time when he was in the custody of immigration authorities." (*Id.* at 5 n.5.) "The other failures to appear are from 1995, 1999, and 2000." (*Id.*) In other words, Juarez-Vasquez has otherwise made all of his court appearances for the past roughly 25 years. (*See also* ECF No. 37 at 12–13.) Juarez-Vasquez adds that he has "completed multiple terms of probation without incident, demonstrating his ability to follow conditions . . . ." (*Id.*)

In the Court's view, this history of compliance outweighs his prior unlawful entries in the context of whether he is likely to comply with court orders and appear when required pretrial.

**D.   Danger to the Community**

Finally, the Court considers the nature and seriousness of the danger to any person or the community that would be posed by Juarez-Vasquez's release. The Government's sole support for the argument that Juarez-Vasquez poses a danger to the community is his history of DUI offenses. (ECF No. 33 at 12.) The Court has already found that the safety of the community can be reasonably assured through the conditions of confinement imposed by Judge O'Hara. It will not rehash that discussion.

## IV.   CONCLUSION

Synthesizing the Court's analysis of the relevant factors above, it FINDS that,

taken together, the Government has not met its burden to show (1) by a preponderance of the evidence, that no conditions or combinations will reasonably assure Juarez-Vasquez's appearance as required and (2) by clear and convincing evidence, that no condition or combination of conditions will reasonably assure the safety of the community.   § 3142(g).

Accordingly, the Court ORDERS as follows:

1. The Motion (ECF No. 33) is DENIED;

2. The Court ORDERS the IMMEDIATE RELEASE of Juarez-Vasquez;

3. The Court DIRECTS counsel for the Government, for the Defendant, the U.S. Marshal Service, and the Probation Office, to use and coordinate their best efforts to effect the immediate release of Juarez-Vasquez; and

4. Upon release Juarez-Vasquez shall CONTINUE ON BOND and shall be subject to ALL CONDITIONS imposed by Judge O'Hara in the Order Setting Conditions of Release (ECF No. 31).

Dated this 16th day of May, 2025.

BY THE COURT:

William J. Martinez
Senior United States District Judge